## CINCINNATI (city) et v GAMBLE, et

Common Pleas Court, Hamilton Co.

Nos. A-65586-7-8. Decided Nov. 17, 1939.

John D. Ellis, city solicitor; Henry M. Bruestle, asst. city solicitor, Cincinnati, for City of Cincinnati.

Edw. F. Alexander, asst. city solicitor, Cincinnati, for defendant.

William Jerome Kuertz, Cincinnati, and Charles O. Rose, Cincinnati, amici curiae.

## OPINION

By SCHNEIDER, J.

These three cases were heard and submitted together. The petition in the first numbered case was filed by the city of Cincinnati as plaintiff and seeks an injunction restraining various officials of said city of Cincinnati from proceeding further under certain ordinances adopted by the council of said city of Cincinnati, under date of June 24, 1931, insofar as said ordinances apply to members appointed to the police and fire forces of said city.

The petition in the second cause was filed by the state of Ohio, on relation of John D. Ellis, city solicitor of the city of Cincinnati, seeking a writ of mandamus to compel certain officials of said city of Cincinnati to appoint members of the board of trustees of the Police Relief Fund of said city in accordance with the provisions of the General Code of Ohio.

The third cause results from a petition filed on relation of John D. Ellis, city solicitor of the city of Cincinnati, seeking a writ of mandamus to compel the city officials of the city of Cincinnati to make appointments to the board of trustees of the Firemen's Relief and Pension Fund of said city in accordance with the statutes of the state of Ohio.

The pleadings reveal the following facts, namely; that many years ago the city of Cincinnati declared the necessity for the establishment of a Police Relief Fund and a Firemen's Pension Fund within and for the said city of Cincinnati, having proceeded in accordance with the provisions of the statutes of Ohio then in force; on April 3, 1929, the laws relating to such Firemen and Police Funds were amended and changed with respect to the appointment of and the qualifications of personnel of boards of trustees authorized to administer such funds, but that notwithstanding such amended and changed laws the officials of the city of Cincinnati failed and refused to comply with said amended and changed laws in the appointment and personnel of the respective boards of trustees

of said funds and permitted the boards appointed under the original laws to continue the administration of said funds respectively up to and including the present time; thereafter, under date of June 24, 1931, the city of Cincinnati, by ordinance of council, adopted a so-called City Retirement System for city employees and caused the provisions of said ordinance to apply to members of the police and fire departments to be employed after the effective date of said ordinance and compelling such employees to join the said city retirement fund and prohibiting them from joining the respective funds administered by the boards of trustees of the Police and Firemen's Pension Relief Funds then and there in existence under the laws and statutes of the state of Ohio.

It is not necessary, in the opinion of the court, to review the details of the various plans for relief and pensioning of members in these departments.

The question of law presented by the issues joined is whether or not the city of Cincinnati had authority to apply the provisions of its ordinance creating the city retirement system to those of its employees in the police and fire departments, in view of the conflicting provisions of the General Code of Ohio with reference to the operation of firemen and police pension and relief funds in municipalities of the state.

**Sec. 7 of Art. 18, Constitution of Ohio,** provides:

"Any municipality may frame and adopt or amend a charter for its government and may, subject to the provisions of Section 3 of this article, exercise thereunder all powers of local self-government."

Sec. 3 of the same article provides:

"Municipalities shall have authority to exercise all powers of local self-government and to adopt and enforce within their limits such local police, sanitary and other similar regulations, as are not in conflict with general laws."

It is the opinion of this court that

any municipal corporation in the state of Ohio, which finds it necessary to establish any form of police and firemen's relief, pension or retirement fund for the benefit of such class of employees of said municipality is required to, do so under the provisions of the General Code of Ohio, and that it is without the power of the city of Cincinnati to administer any pension, relief or retirement system contrary to the provisions of those laws.

The respective merits of the pension and retirement systems provided by the state laws and by the city ordinances have been presented pro and con from the standpoint of acturial soundness. This court, however, is not concerned with the soundness of varying theories of benefit and retirement systems; nor is the court concerned with whether or not a municipal corporation should have such discretionary authority under the provisions for home rule contained in the constitution of Ohio. Both these considerations should be addressed to the legislature of Ohio and to the citizens of our state.

Suffice to say that the provisions of **Sec. 3 of Art. 18 of our constitution** appear to clearly provide that municipalities under a charter form of government may exercise only such powers of local self-government as are not in conflict with the general laws.

Entries may be drawn granting the prayer of the petition in cases No. A-65587 and 65588 and a writ will issue in accordance with such prayer in each case. In case No. A-65586, a restraining order will be granted in part as prayed for; i. e., the court will restrain the defendants from appropriating to the retirement system of the city monies, taxes and appropriations from the treasury of said city as the city's contribution toward said city retirement system for police and firemen employees, and said defendants will be, by mandatory injunction, compelled to refund to the treasury of said city all monies heretofore received by them as the city's contribution toward said fund in behalf of police and firemen employees.

The court will retain said cases for further consideration as to a proper and just disposition of claims by any individuals of the police and fire departments of said city, whose rights may be affected by such order.

## APPLICATION FOR REHEARING

No. A-65586-7-8. Decided Dec. 28, 1939

By SCHNEIDER, J.

Following the original opinion rendered in the three cases herein, an application for rehearing on behalf of the defendants was filed, since which time the court has been in receipt of numerous letter briefs from various counsel in interest.

The court has, therefore, given further consideration to the issues raised as if on rehearing.

It is strongly urged by Mr. Alexander that the Police Relief and Firemen's Pension funds, being administered exclusively by the government of the city of Cincinnati, may be operated contrary to the provisions of the General Code of Ohio.

The issue thus raised brings into direct question the extent to which municipalities in our state may exercise powers of local self-government.

There exists a popular fallacy that so-called "charter" cities may exercise greater powers of self-government in Ohio than non-charter cities. The fact is the city of Cincinnati, because of its charter adopted in 1924, may not exercise any greater authority as a municipal corporation than may the cities of Norwood, St. Bernard, Cheviot or any other municipal corporation within the state of Ohio. By the same token the city council of the city of Cincinnati may not exercise any greater powers of government now than before the city of Cincinnati adopted its Home Rule Charter in 1924.

It was by means of its charter that the city of Cincinnati adopted the city manager form of government and provided the manner and means of the selection of its various administrative officials.

However, when we consider the question of what powers the city of Cincinnati or its officials may exercise, and

what laws it or they may administer, we are controlled not by the charter of the city of Cincinnati but by the **Constitution** and laws of the state of Ohio.

It seems advisable therefore, to review the history of the so-called home rule provisions of the **Constitution of Ohio** as amended in 1912. These amendments were prepared by the Constitutional Convention of the state of Ohio which convened January 9, 1912, and adjourned August 26th of the same year. The proposal for municipal home rule was submitted by a committee of the Constitutional Convention designated "The Committee on Municipal Government."

The avowed purpose of the proposed amendment was clearly stated by that committee, preceding the debates which followed the proposal, all as recorded in the proceedings of the convention.

The committee proposed to accomplish three things:

First: To make it possible for different cities in the state, if they desired, to have different forms and types of municipal organization;

Secondly: To provide that municipalities shall have power to do those things, with reference to local government, which are not prohibited or forbidden by the Legislature or are not in conflict with the general laws under the police power, so that the presumption would thereafter be in favor of the legality of the acts of a municipality; which presumption would be only overcome by showing that the power had been denied to municipalities or that it was against the general laws of the state;

Thirdly: To broaden the powers of municipalities with reference to the operation of public utilities.

The first of these objectives was accomplished by the provisions of **Sec. 7 of Art. XVIII**, under which the city of Cincinnati, by its charter, provided a form of government and a method of selecting its governing officials under such form which is different and distinct from other municipal corporations within the state. This constitutes all of the authority granted to municipalities under Section 7, i. e., it constitutes all of the authority which any municipality adopting a charter may have, because **Section 7** is subject, by its terms, to all of the limitations contained in **Sec. 3 of Art. XVIII.**

The third purpose stated is not in issue here.

The second purpose intended to be accomplished by the framers of the amended Constitution was accomplished, if at all, by the provisions of said **Sec. 3 of Art. XVIII.** The original proposal presented to the Constitutional Convention concluded as follows:

"* * * Municipalities shall have power to enact and enforce within their limits such local, police, sanitary and other similar regulations as are not in conflict with general laws, affecting the welfare of the state as a whole * * * and no such regulations shall by reason of requirements therein, in addition to those fixed by law, be deemed in conflict therewith unless the General Assembly, by general law, affecting the welfare of the state as a whole, shall specifically deny all municipalities the right to act thereon."

In debating this language it is quite clear from a reading of the record that strenuous objection was made to limiting the words "general law." This is indicated for example by the question of one member of the convention as follows:

"Don't those words limit the words 'general law,' and with them in their authority would be granted to the municipality to enact some laws that were in conflict with general laws, but they must be not in conflict with general laws affecting the welfare of the state as a whole?"

And further:

"And that being so, can municipalities pass some laws in conflict with general laws provided those general laws are held not to affect the welfare of the state as a whole?"

In answer to this question Mr. Knight, the chairman of the committee, said:

"Yes, I think so."

As a result of this debate an amendment was proposed striking out the words:

"affecting the welfare of the state as a whole."

In speaking against this amendment Mr. Smith of Hamilton said:

"If the Anderson amendment which strikes at the essence of home rule shall prevail and no substitute is provided, the municipalities in Ohio will have no measure of home rule * * *. If any act of the city can be rendered null and void by law of the state, where are we? Only where we are today?"

In connection with the debate on the adoption of this amendment Member Jones had this to say:

"This provision applies to municipalities. That doesn't mean only big cities of the state. It means smaller cities and villages as well. Now the rule with reference to municipalities, big or little, is that they can exercise such powers and such powers only as are conferred upon them by legislation. The proposition here is to reverse that rule, under which we have been living for 60 years, * * *. So, after all, it comes right down to the bald proposition that the rule must be established in Ohio that municipalities shall be permitted to do anything they want to do that they are not prohibited by general law from doing * * *."

Thereupon Mr. Smith of Hamilton asked:

"Do you know that the cities can not have home rule under your amendment?"

The answer was:

"* * * As I understand the home rule proposal, it is a proposition that allows cities to frame their own charter and make for themselves such laws as they deem wise, **provided those laws do not** **conflict with the general laws of the state.** * * *"

At the conclusion of the debate the section was reported out for adoption as amended.

When it was later reported out for action a comma had been inserted after the word "self-government". This comma then became the subject of debate and Mr. Winn of the convention spoke as follows:

"It is proposed to insert a comma after 'self-government', so that the municipality shall have authority to exercise all powers of local self-government without any restraint by the general laws of the state. Do you get that?"

Mr. Doty then said. "That is what they ought to have."

Mr. Winn responded:

"You see the importance of all this, so if we now insert a comma after the word 'self-government' and thereby limit the right of municipalities by general laws to only such things as relate to local police, sanitary and other regulations then we have the same unrestricted rights on the part of municipalities to adopt a charter that was not intended and it ought not be allowed now."

Following this debate the comma was stricken and the amendments were finally adopted as they now appear of record.

The intention of the constitutional convention was clear, therefore, that the clause "as are not in conflict with general laws" limits both grants of power contained in said Section 3. If any other construction were now given by this or any other court the effect would be to place after the word "self-government" the same comma which was so dramatically excluded by the framers of the amendment. Under such a construction and such a practice this or any other court could in reality amend the Constitution, a right which, it is to be hoped, will forever remain the exclusive possession of the people of Ohio.

244

This court is of the opinion therefore that the effect of the home rule amendments to the **Constitution of Ohio** as adopted in 1912 is to give all municipalities of Ohio, whether home rule charters are adopted or not, the authority to exercise powers of local self-government without the necessity of first obtaining authority from the Legislature of the state; but that such cities are not empowered to exercise any authority which is in conflict with laws enacted by the Legislature of the state.

The court will therefore adhere to its finding as announced in the original opinion.